UNITED STATES of America,
Plaintiff,

v.

The BOARD OF SCHOOL COMMISSION-
ERS OF the CITY OF INDIANAPO-
LIS, INDIANA, et al., Defendants.

No. IP 68–C–225.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Aug. 18, 1971.

John D. Leshy, Civil Rights Division, Office of Attorney General, Department of Justice, Washington, D. C., Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for plaintiff.

G. R. Redding, Stephen W. Terry, Jr., E. C. Ulen, Jr., Baker & Daniels, Indianapolis, Ind., for defendants.

Harold E. Hutson, Indianapolis, Ind., amicus curiae.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This action, filed May 31, 1968, was tried by the Court on July 12–21, 1971. The Court has considered the voluminous testimony, the more than 200 exhibits, the post-trial briefs, has taken judicial notice of certain historical facts believed to be matters of common knowledge, and now files its findings of fact and conclusions of law in the form of this memorandum. Rule 52(a), Federal Rules of Civil Procedure.

## I. GENERAL

This is a school desegregation action brought by the United States pursuant to Section 407(a) and (b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6(a) and (b). The defendants are The Board of School Commissioners of Indianapolis, Indiana (hereinafter "School Board" or "Board"), the members of the Board, and its appointed Superintendent of Schools.

The defendant School Board is a common school corporation organized and existing under the laws of the State of Indiana. It is situated within Marion County, Indiana, and governs, manages, and controls all of the public elementary and high schools within a geographical area known as the School City of Indianapolis (hereinafter "School City"), all as required by Indiana law. The shape of the School City resembles that of a trussed fowl, with its head to the north, its bound feet to the south, and its flapping wings extending east and west. The east-west wingspread, at its greatest, is

about 16 miles. The north-south dimension of the School City is about 13 miles.

During the 1970–71 school year, the School Board operated 110 elementary schools. The usual (but not invariable) grade structure of the elementary schools was a kindergarten-through-eighth-grade structure. Among these 110 schools were 6 junior high schools. During the 1970–71 school year, two of the elementary schools were devoted entirely to the education of mentally retarded children, and one of the elementary schools was devoted entirely to the education of physically handicapped children and children having both physical and mental handicaps.

During the 1970–71 school year, the School Board operated 11 high schools. With the exceptions hereinafter noted, each of these high schools housed students in grades 9 through 12 who had attended one of the "feeder schools" regularly assigned to the particular high school. The exceptions to these general statements are that Crispus Attucks High School (hereinafter "Crispus Attucks") housed students in grades 10 through 12 only, its 9th grade class having been divided between the newly acquired Cold Spring Campus and Northwest High School (hereinafter "Northwest") and that Shortridge High School (hereinafter "Shortridge") housed a 9th grade made up of students from assigned "feeder schools" and 3 classes of students who were attending Shortridge under "the Shortridge Plan." Also, a comparatively small number of students were transferred to high schools other than those to which originally assigned, pursuant to the transfer policies of the Board.

The total enrollment in the elementary schools at the close of the 1970–71 school year was 77,658 students (excluding special education students). Negro students constituted 37.4% of that total. The total enrollment in the high schools at that time was 22,487 students. Negro students constituted 33.6% of that total. There were approximately 4,379 faculty members, of whom 976 (22%) were Negro.

Of the seven persons currently serving as members of the School Board three are Negroes (Mrs. Cary D. Jacobs, The Reverend Landrum E. Shields, and Mr. Robert D. DeFrantz). Mr. Shields served as President of the School Board from the date of the Board's first meeting in July, 1970, until July 13, 1971, on which latter date Mr. DeFrantz was elected to the Presidency, in which position he presently serves. The Board does not appear to be polarized along racial lines, and the personnel of central administration, operating under the direction of the Superintendent, likewise reflects a reasonable racial balance.

On February 6, 1970, an Indiana not-for-profit corporation, Citizens of Indianapolis for Quality Schools, Inc., attempted to intervene herein as a party defendant, asserting that its membership consisted exclusively of parents of students in the Indianapolis public schools who possessed a legally cognizable interest in the proceeding on such account. The motion to intervene was accompanied by petitions executed by some 5,000, more or less, parents who requested such intervention. The petition to intervene was denied by the Court, for the reason that the corporation did not appear to have an interest sufficient to permit intervention as of right pursuant to Rule 24 (a) (2), F.R.C.P. Hobson v. Hansen, D.C. Dist., 1968, 269 F.Supp. 401; Blocker v. Board of Education of Manhasset, New York, E.D.N.Y., 1964, 229 F.Supp. 714. Permissive intervention was also denied. However, Mr. Harold E. Hutson, attorney for the petitioner, was permitted to appear as amicus curiae, and in such capacity he attended the trial, was furnished with copies of all exhibits, and participated in the argument and post-trial briefing.

## II. THE ISSUES

There are but two ultimate factual issues in this case, and two critical dates. The two dates are May 17, 1954, the date

**658**

of the decision of the Supreme Court of the United States in Brown v. Board of Education of Topeka (*"Brown I"*), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180, and May 31, 1968, the date on which this suit was filed.

■ *Brown I*, of course, held that in the field of public education the doctrine of "separate but equal" has no place, and that segregation of children in public schools by operation of law solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprives the children of the minority group of equal educational opportunities and hence of the equal protection of the laws guaranteed by the Fourteenth Amendment. Approximately one year later, in the same case (*"Brown II"*), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Court ordered the District Courts involved in *Brown* and its companion cases "to take such proceedings and enter such orders and decrees * * as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." It thereupon became the duty of all of the States, operating through their various agents, i. e., boards of school commissioners and the like, such as the defendant Board, to desegregate such school corporations as were practicing *de jure* segregation of their pupils as of May 17, 1954.

The two ultimate issues herein may therefore be stated as follows:

1. Did the School Board operate a dual school system, or, put another way, did it have a deliberate policy of segregating minority (Negro) students from majority (white) students in its schools on May 17, 1954?

2. If the answer to the first question is in the affirmative, had the Board changed its policy so as to eliminate such *de jure* segregation on or before May 31, 1968?

■ The plaintiff United States of America has the burden of proving the affirmative of the first issue and, if proved, the negative of the second. The

defendants deny *de jure* segregation on either of the critical dates, and further urge that a third critical date must be considered: the date of trial. Their argument in the latter connection is that no matter what may have gone before, if the Board is operating a unitary system as of the date of trial there is no justification for judicial intervention or for the granting of relief in equity.

■ As will be set out in more detail hereafter, the Court finds for the plaintiff on each of the ultimate issues of fact. The argument that conditions as of the date of trial should control the action is rejected, first for the legal reason that complaints, and the proof of same, must relate to conditions as of the date of filing; plaintiff is always entitled to judgment, if only for costs, if it proves the essential elements of its complaint as of such time. It is true that the initiation of a legal action may, and frequently does motivate the defendant to grant all or part of the relief sought prior to trial, thus rendering the action moot in whole or in part. In a simple action such as a suit on account, where the only relief sought is money, it is obvious that payment in full by the defendant before trial would effectively render the action moot for all time, save for payment of costs. Where the relief sought is equitable, however, particularly in a complex case such as this where the equitable relief sought is affirmative rather than being limited to a negative injunction, voluntary compliance in advance of trial would not deprive the Court of jurisdiction to insure the continuation of such compliance by appropriate orders. In any event, however, the Court finds that the Board had not, as of the date of trial, effectively desegregated its school system to the extent required by *Brown II*.

### III. HISTORY

Perhaps one of the greatest public misunderstandings as to the operation of the public schools of the State of Indiana is that the responsibility for the conduct of

such schools is purely local. It is not difficult to understand the basis for such misconception as the schools are, as a practical matter, operated by local boards, locally elected, subject only to the general oversight of the Indiana State Board of Education and the State Superintendent of Public Instruction. They are paid for to a large extent by funds derived from local property taxes. That part of the property tax allocated to the funding of the public school system constitutes by far the largest portion of the taxes levied in every taxing unit of the State. (The 1971–72 budget adopted by defendant Board is in excess of $82,000,000.)

■ Nevertheless, the fact remains that the ultimate responsibility for the public schools, and the duty to provide a "general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all" is placed squarely upon the State.[1] It has therefore been held in numerous cases that the State school system is a State institution, and that school corporations organized under, or by virtue of, the laws of the State are but the agents of the State.[2] Therefore, in reviewing briefly the events leading up and contributing to the educational plight of the Negro in Indianapolis in 1954, 1968, and at present, it is necessary and proper to consider historic policies of the State and various of its agencies, as well as the acts and omissions of the Board itself.

### A. Territorial Attitudes

The first twenty Africans who lived within the boundaries of what later became the original thirteen States landed at Jamestown, Virginia, in 1619, thus predating by a year the more highly publicized landfall at Plymouth Rock. In early Virginia, as in other colonies, the first Negro settlers were free, and accumulated land, voted, testified in court and mingled with whites on a basis of equality.[3] Unfortunately for them and their progeny, in the 1660's Virginia, Maryland and other states enacted the first of a series of laws which later led to the establishment of slavery on the basis of race, with results which are well known.

Virginia and Virginians played major roles in the early history of Indiana. At one time Kentucky was merely a county of that Commonwealth, which also claimed all of the lands north and west of the Ohio River, east of the Mississippi and south of Canada. Many of the earliest white settlers of Indiana were Virginians and they, together with persons of similar background from Kentucky and the Carolinas, all States where slavery was practiced, made up the majority. When Virginia ceded the Northwest Territory in 1784, it was pursuant to a reservation of land to be donated to General George Rogers Clark and members of his Virginia regiment for services rendered in the Revolutionary War,[4] and such grants were made—many for tracts in Indiana. The first territorial governor of the Indiana Territory, following its establishment in 1800, was William Henry Harrison, another Virginian. The son of an influential Virginia planter, he could scarcely have avoided the culture of the southern country gentleman.[5]

The racial attitudes of Harrison and the early settlers of the Territory (which

---

1. Constitution of the State of Indiana, 1851, Art. 8, § 1.

2. Ratcliff v. Dick Johnson School Twp., 1933, 204 Ind. 525, 185 N.E. 143; Greathouse v. Board of School Com'rs, 1926, 198 Ind. 95, 151 N.E. 411; Ehle v. State ex rel. Wissler, 1922, 191 Ind. 502, 133 N.E. 748; School Town of Windfall City v. Somerville, 1914, 181 Ind. 463, 104 N.E. 859; Jordan v. Logansport, 1912, 178 Ind. 629, 99 N.E. 1060; State ex rel.

Warren v. Ogan, 1902, 159 Ind. 119, 63 N.E. 227; Freel v. School City of Crawfordsville, 1895, 142 Ind. 27, 41 N.E. 312.

3. L. Bennett, Jr., Before the Mayflower, 29–36 (3rd Ed. 1966).

4. Act of Virginia, December 20, 1783. 1 Burns Ind.Stat.Ann. 369 (1955 Repl.).

5. J. Barnhart & D. Riker, Indiana to 1816, at 315 (1971) (hereinafter "Barnhart & Riker").

also included, among other land, all of present day Illinois) quickly became apparent. Although Article 6 of the Ordinance of 1787, providing for the government of the Northwest Territory, prohibited slavery and involuntary servitude in the Territory,[6] which provision was carried forward to the Indiana Territory,[7] they set about immediately to secure the repeal or suspension of Article 6.[8] When the Congress failed to act favorably upon their repeated requests, Harrison and the territorial judges, acting in their legislative capacity, went so far as to adopt a law in 1803 providing that Negroes and mulattoes brought into the territory must perform the service due their masters and that contracts between master and servant were assignable.[9] Another such law provided that slaves purchased outside Indiana and brought within the territory had the Hobson's choice of agreeing to being bound to service, or of being taken out of the territory (presumably for resale).[10] Some Negroes were bound to service under indentures for as long as ninety-nine years.[11]

### B. Statehood: General Policies

Statehood brought no immediate change. Although slavery was once again prohibited, it is noteworthy that of 1,326 Negroes counted in the 1820 census, 503 were candidly listed as slaves.[12] Discrimination became the official policy of the State, as evidenced by the successive Constitutions of 1816 and 1851, and by the laws enacted by the General Assembly. For example, both Constitutions limited the right to vote [13] and to serve in the militia [14] to white males; these restrictions were not removed until the adoption of constitutional amendments in 1881 and 1936, respectively. A statute of 1818, similar to one enacted during the territorial period, declared that no person with a fourth or more of Negro blood could give testimony in court in a case involving a white party.[15]

Intermarriage between whites and persons of Negro blood was likewise prohibited in 1818.[16] Subsequently, the Act was clarified so as to extend the prohibition to a person having one-eighth part or more of Negro blood, and made violation a felony punishable by a fine and imprisonment for from one to ten years. Such statute, as it existed in 1871, was unanimously held constitutional by the Supreme Court of Indiana,[17] notwithstanding the adoption in 1868 of the Fourteenth Amendment to the Federal Constitution. The last reenactment of such law [18] was not repealed until 1965. Similarly, an 1852 act [19] declared such marriages to be void, thus creating obvious limitations on the right of inheritance and other legal benefits upon the death of a spouse.[20] This law, too, was not repealed until 1965.

---

6. 1 Burns Ind.Stat.Ann. 376 (1955 Repl.).

7. Act of May 7, 1800. 1 Burns Ind.Stat. Ann. 380 (1955 Repl.).

8. See generally Barnhart & Riker, 334–335, 347–354.

9. Philbrick (ed.), Laws of Indiana Territory, 1801–1809, at 42–46.

10. Ibid., 136–139.

11. E. Thornbrough, Since Emancipation, 1 (1963) (hereinafter "Thornbrough").

12. W. Heiss (ed.), 1820 Federal Census For Indiana (1966).

13. Constitution of 1816, Art. 6 § 1; Constitution of 1851, Art. 2 § 2.

14. Constitution of 1816, Art. 7 § 1; Constitution of 1851, Art. 12 § 1.

15. Acts 1818, Ch. 3, § 52, p. 39.

16. Acts 1818, Ch. 5, § 59, p. 94.

17. State v. Gibson, 1871, 36 Ind. 389.

18. Acts 1905, Ch. 169, §§ 638, 639, p. 584.

19. 1 R.S. 1852, Ch. 67, § 2, p. 361.

20. As recently as 1940 the 1852 Act was raised in defense of a claim for death benefits under the Indiana Workmen's Compensation Act, the contention being that the widow, a Negro, could not have been married to the decedent because he was white. The Appellate Court held the defense good as a matter of law, if proved, but affirmed the Industrial Board's award to the widow on the interesting ground that the decedent, a Mexican, had not been proved to be "white." Inland Steel Co.

The most striking evidence of the hostility of the white majority was shown in efforts to exclude Negroes from the state and to persuade those already in the state to leave. A law of 1831, which was seldom enforced, required Negroes coming into the state to post bond as a guarantee against becoming a public charge and as a pledge of good·behavior. More drastic was Article 13 of the Constitution of 1851 which flatly prohibited Negroes and mulattoes from coming into the state and which provided for penalties for persons who encouraged them to come. Closely linked to the exclusion movement was the colonization movement, which sought to preserve the soil of Indiana for white men by sending Negro residents to Africa. A state colonization society, affiliated with the American Colonization Society, had been organized in 1829 but had never accomplished much. Article 13 of the Constitution of 1851 contained a section encouraging colonization. For several years the state legislature appropriated money for a colonization fund and paid the salary of a State Agent who was supposed to encourage Negroes to emigrate to Africa.[21] Article 13 was held to be null and void in 1866.[22]

In 1885, the General Assembly passed a civil rights law providing that all persons within the jurisdiction of the State were entitled to full and equal enjoyment of the accommodations of "inns, restaurants, eating-houses, barber shops, public conveyances on land and water, theaters, and all other places of public accommodation and amusement;" such law also prohibited discrimination because of race or color in the selection of jurors.[23] It is common knowledge that until the past decade, many parts of this law were more honored in their breach than in their observance, particularly as to the first four categories, often with an assist from the judicial arm of the State.[24] Negroes were rarely admitted, save on a segregated basis, to theatres,[25] public parks, and the like, including State parks operated by the Indiana Department of Conservation, until after World War II. They were confined to segregated wards in public hospitals supported by tax funds, and as we shall see, largely attended segregated schools.[26]

### C. Housing Policy

Before turning attention to the schools, however, another area of segregation needs mention, and that is in the matter of housing. Just as was the case in Virginia, so in Indianapolis persons of African descent were present from the beginning. It has been recorded that on the very mission which resulted in the location of the new state capitol on the banks of Fall Creek, Governor Jennings was accompanied by a Negro boy known to history only as Bill.[27] More to the point, Ephriam Ensaw, a freed man who

---

v. Barcena, 1942, 110 Ind.App. 551, 39 N.E.2d 800.

21. Thornbrough, p. 2.

22. Smith v. Moody, et al., 1866, 26 Ind. 299.

23. Acts 1885, Ch. 47, p. 76.

24. See, for example, the ingenuous decision in Chochos, et al., v. Burden, et al., 1920, 74 Ind.App. 242, 128 N.E. 696, wherein two Negro women refused service in a Greek candy kitchen selling ice cream, soda water, etc., for consumption on the premises had their judgments for nominal damages reversed on the ground that such an establishment did not constitute an "eating-house."

25. In 1932, when an Indianapolis movie house opened its doors free to Butler University students in celebration of a football victory, Negro students were barred. Thornbrough, p. 88. (Presumably, however, the celebrants all marched to the tune of *Butler Will Shine Tonight*, the school cheer song written, when a student, by Noble Sissle, an Indianapolis Negro. Sissle went on to national fame as a musician, composer, orchestra leader, and writer/producer of successful Broadway musicals.)

26. For an extended discussion of these and similar examples of State imposed or tolerated segregation, see Thornbrough, pp. 86-93.

27. Leary, Indianapolis The Story of a City (1970), p. 8 (hereinafter "Leary").

worked for wages, settled in the new town, along with various white settlers, even before the surveyors had finished staking the lots.[28]  However, by the time the first German and Irish immigrants had been imported in 1836 to work on the Central Canal, most Negroes were to be found in "Colored Town," on the outskirts of the mile square,[29] and were later concentrated in the area around Indiana Avenue.

Segregation in the housing of Negroes in Indianapolis has persisted at least until the date of the filing of this action.[30]  As the evidence in this case discloses without conflict, Negroes were discouraged from purchasing homes in predominantly "white" neighborhoods by various methods: white realtors refused to show such homes to Negroes (and no Negro real estate broker was permitted to become a member of the Indianapolis Real Estate Association until 1962), a two-price system was used: a realistic market price to whites and a ridiculously inflated price to Negroes, lending institutions refused to finance homes sought to be purchased by Negroes in "white" areas.  Those pioneering Negroes who nevertheless overcame all obstacles and succeeded in purchasing such a home were then harassed by such devices as threatening and obscene telephone calls, stones hurled through windows, neighborhood ostracism, etc.[31]  Certain streets and other landmarks, such as Fall Creek, White River, certain railroad tracks, etc., were regarded at different times as bar-

riers to be hurdled by Negroes at their peril.

In addition to pressures of the foregoing type, applied by individual whites, residential segregation was also enforced by law, in many instances.  Perhaps the best known method was by means of the racial covenant which, when inserted into a deed or plat of a real estate subdivision, limited ownership of the lot to persons of the white race.  As may be noted from a cursory observation of plats recorded in the plat books kept in the office of the recorder of Marion County, many of the better known subdivisions, such as Williams Creek Estates, Broadmoor Estates, Meridian Hills, Highwoods Addition, Forest Hills, Wellington Estates, Fall Creek Highlands, Greenslopes, Wynedale, Ellenberger Plaza, and Meridian-Kessler Terrace, contained such covenants, which were routinely enforced until held unconstitutional in 1948.[32]

As shown by the evidence herein, the City of Indianapolis took official action to enforce segregation in 1926 when the City Council, with only one dissenting vote,[33] adopted General Ordinance No. 15, making it unlawful for any Negro "to establish a home-residence on any property located in a white community or portion of the municipality inhabited principally by white people * * *," or for a white person to commit the same act in a Negro community.  The ordinance imposed a fine and imprisonment for violation, and further provided that each seven days maintenance of such a residence would be deemed a separate offense.[34]  Passage of the ordinance was

28. Ibid., p. 13.

29. Ibid., p. 50.

30. The Civil Rights Act of 1968, Pub.L. 90–284, 82 Stat. 81, 42 U.S.C. §§ 3601 et seq, was not fully effective until December 31, 1969, and its effects have barely begun to be felt.

31. One who received such treatment was Mr. Grant Hawkins, a graduate of Indiana University, successful businessman, and first Negro member of the School Board.  For a more detailed discussion, see Thornbrough, pp. 22–29.

32. The plats of Kessler Park and Crippin's River Park Addition were recorded with racial covenants in 1949, after they had already been held unconstitutional by the Supreme Court in Hurd v. Hodge, 1948, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187.

33. The Honorable Edward B. Raub voted in the negative.

34. The Mayor and most members of the City Council of this period (not including Raub) had been elected with the support of the Ku Klux Klan.  For a short summary of the Klan era see Leary, Ch. 23.

noted by The Indianapolis News, then and now one of Indiana's leading newspapers, which stated that "Sincere convictions are represented in the ordinance \* \* \*" and "Patience and forbearance are called for."[35] When the Marion Circuit Court held the ordinance unconstitutional a short time later, The Indianapolis News had a plan of action. "One thing should be done as soon as possible," it editorialized, "and that is to pave the streets in colored neighborhoods, and make them so attractive that there will be no desire to get out of them \* \*. The surroundings should be made as good as those in white sections, so that there may be no reason for leaving them."[36] As recently as July 4, 1963, the major Indianapolis newspapers, in their real estate want ad columns, used the designation "for colored," or "col." in describing residential property in certain sections of the city.

It is common knowledge that in many small towns and a few larger ones in Indiana the custom that Negroes were not allowed to stay overnight was so invoidable that it had the force of law and was actually enforced by local officials.[37] Thus today it is noticeable that almost no Negroes are to be found in communities adjoining the School City of Indianapolis. Marion County has three municipalities other than Indianapolis, all contiguous to the School City. Beech Grove, an industrial community of 13,-432, has a Negro population of 19. Speedway City, a similar type community, has 68 Negroes out of a total population of 14,951, while Lawrence has 216 Negroes out of a total population of 18,997. Of Marion County's 792,299 residents, 134,474 or 17% are Negro. Of these, approximately 122,086, or 98.5%

are confined to the central area served by the defendant School Board.[38]

The Bureau of the Census recognizes approximately 250 standard metropolitan statistical areas in the 1970 census.[39] Such an area is a county or group of contiguous counties which contains at least one city of 50,000 or more inhabitants and which according to certain criteria, are socially and economically integrated with the central city. The Indianapolis Metropolitan Statistical Area has 1,109,-882 inhabitants and includes, in addition to Marion County, the contiguous counties of Boone, Hamilton, Hancock, Hendricks, Johnson, Morgan, and Shelby. The 1970 census figures reflect a total of 2,849 Negroes out of a total population of 317,583 residing in these seven suburban counties, a percentage of 0.897.

### D. School Policies to 1949

In early Indiana, as has been seen, the Negro lacked many of the rights which are the ordinary attributes of citizenship. The plain fact is that, although entitled to certain rights under Indiana law, such as the right to own property and the right to personal liberty, Negroes were not considered to be citizens of the State until the adoption of the Fourteenth Amendment to the Constitution of the United States.[40] For this reason, many of the rights conferred upon citizens by the successive Indiana Constitutions were construed as not applying to Negroes.

Thus in an early case it was held that Negro children could not attend school with white children over the protest of a white parent, even if they paid their own tuition.[41] A statute in force in 1861 barred Negroes, mulattoes and the children of mulattoes from admission to the common schools.[42] After the adoption of

---

35. The Indianapolis News, editorial, March 16, 1926.

36. Ibid., November 24, 1926.

37. Thornbrough, p. 21.

38. All statistics are based upon the 1970 census.

39. Bureau of the Budget, Standard Metropolitan Statistical Areas (1967, as supplemented).

40. Cory, et al. v. Carter, 1874, 48 Ind. 327.

41. Lewis v. Henley, et al., 1850, 2 Ind. 332.

42. Draper, Trustee, et al. v. Cambridge, 1863, 20 Ind. 268.

the Fourteenth Amendment, the General Assembly in 1869 enacted a law providing, for the first time, for the education of Negro children, but providing also for them to be organized into separate schools. The statute provided that if there were not a sufficient number of such children within attending distance to form a school in one district, several districts could be consolidated; and if there were not enough to be consolidated within a reasonable distance, "the trustee * * * shall provide such other means of education for said children as shall use their proportion, according to members, of school revenue to the best advantage." [43]

The case of Cory et al. v. Carter [44] was commenced by Carter, a Negro parent of school age children, against the school officials of Lawrence Township, Marion County, to compel them to accept his children as pupils in the "white" district school, such officials having failed to provide any school in that or any adjoining district near enough for his children to attend, whereby they were denied the right to attend any school at all. He secured an order of mandate from the Marion Superior Court, but the Supreme Court reversed, holding that under the 1869 Act Negro children were not entitled to admission in common schools provided for the education of white students. This holding was reaffirmed in subsequent cases. [45]

In about 1868 Indianapolis erected a new school house and, anticipating the 1869 legislation, assigned the old building on Market Street for the education of Negro children. [46] A separate elementary school was opened there in the fall of 1869. Thus at the very inception of public education for the Indianapolis Negro child, he was segregated by virtue of State law. As will be demonstrated later, *de jure* segregation in the elementary schools continued virtually without change until this action was filed, one hundred years later. The situation with respect to high schools has taken a more erratic course.

Indianapolis's first high school was Shortridge, followed by Emmerich Manual Training and Arsenal Technical. For more than fifty years no separate high school for Negro students was established, and after 1877 school children of both races were permitted to select the high school of their choice, attending on an integrated basis. [47] However, with impetus provided by a petition from the Indianapolis Chamber of Commerce, the School Board on December 22, 1922, adopted a resolution authorizing the construction of a "Colored High School." When such school, Crispus Attucks, was opened in September, 1927, all Negro high school students were forthwith compelled to attend it, regardless of their place of residence in the city. In 1935, Ch. 16 of the Acts of 1869 was further amended to require the Board to provide transportation for Negro students required to travel more than a certain distance by reason of its segregation policies. [48] Thus was instituted the policy of tax-paid transportation of school children (bussing).

Another Act of the 1935 General Assembly is instructive. A law enacted in 1907 had directed township trustees to abandon all schools under their charge at which the average daily attendance had been twelve or fewer pupils. The 1935 act [49] added the following proviso: "Provided, further, that nothing in this act, or in the act to which it is amenda-

43. Acts 1869, Ch. 16, § 3, p. 41.

44. Note 40, *supra*.

45. Greathouse v. Board of School Com'rs, 1926, 198 Ind. 95, 151 N.E. 411; State ex rel. Mitchell v. Gray, et al., School Trustees, 1883, 93 Ind. 303; State ex rel. Oliver, et al. v. Grubb, Trustee, 1882, 85 Ind. 213.

46. Leary, p. 118.

47. Acts 1877, Ch. 81, § 1, p. 124, had amended Ch. 16 of the Acts of 1869 to require admission of Negro students to white schools, if no separate school of comparable grade was provided for Negroes.

48. Acts 1935, Ch. 296, § 1, p. 1457.

49. Acts 1935, Ch. 77, § 1, p. 231.

tory, shall authorize the discontinuance of any school exclusively for colored pupils where such school is the only school for colored pupils in such school corporation, and any such school heretofore discontinued by the operation of such act shall be re-established." (In sum, trustees were ordered by the State to furnish a separate school building and teacher for the instruction of, for example, one Negro child attending primary school, rather than permit that child to attend a white school).

In 1947, two bills were introduced in the General Assembly, each of which had as its purpose the elimination of segregation based on race, color, creed, etc., in the public school system. In due time, a public hearing was held on one of the bills by the House Committee on Education, at which time the then Superintendent of Schools of defendant Board, pursuant to its authorization, appeared and spoke in opposition. Neither bill passed. However, in 1949 an Act was passed which required desegregation, on a phased basis.[50] Thus ended, at least for a time (see Part VII), the official State policy of segregation.

## IV.  BOARD POLICIES, 1949–1954

As has been shown, the official policy of the State of Indiana and of its agent, the defendant School Board, was one of *de jure* separation of its Negro and white students prior to 1949. During the 1948–49 school year only 614 out of a total of 11,304 Negro students (5.4%) attended regular elementary schools of racially mixed population. The other 10,690 pupils attended sixteen all-Negro elementary schools and all-Negro Crispus Attucks High School. The faculty and staff of each school was completely segregated, and the Superintendent's administrative staff was all white. Generally, Negro schools were built in Negro residential areas and white schools in white areas, and when residential patterns were mixed, Negro and white attendance zones overlapped. Grade structures were altered to achieve segregation in some instances. Negro students in the elementary grades were required to walk, or were transported to all-Negro schools when there were schools, serving only white students, closer to their homes. None of these facts are denied by the defendants.

The 1949 Act which abolished segregation in the public schools, required segregated districts to begin desegregating a grade a year by permitting those students enrolling for the first time in kindergarten, the first elementary grade, and the first junior and senior high school grades to enroll in the school nearest their homes. Accordingly, the Board adopted a policy which, on its face, generally followed the provisions of the statute.[51]

In some instances where desegregation would have resulted if children had been assigned to the closest school, they were assigned to segregated schools farther from their homes. The Board's construction policies during the period 1949–53 minimized the amount of desegregation that occurred. The formerly "colored" elementary schools generally remained all-Negro. Likewise, though specific student assignments were made for all high schools, Crispus Attucks remained all-Negro. With one exception, students attending the all-Negro elementary schools, some of which were nearer and more accessible to other high schools, were either assigned exclusively or given an option to attend Attucks; partly as a result of administrative sug-

50.  Acts 1949, Ch. 186, p. 603; Burns Ind. Stat.Ann. §§ 28–6106 to 28–6112 (1970), as amended I.C.1971, 20–4–1–7 to 20–4–1–13.

51.  There were, however, exceptions to this policy. School 19, serving grades 1–6 in 1948–49, did not enroll first grade pupils in 1949–50. Since it was a Negro school in a predominantly white neighborhood, white students in that neighborhood would have been required to enroll in that school under the April, 1949 policy. Negro first graders who would have attended School 19, enrolled at School 64, a nearby all-Negro school, while white students in the School 19 area attended white School 20.

gestion, the option was usually exercised in favor of Attucks. Further, the transfer policies adopted by the Board facilitated the maintenance of segregated high schools.[52]

At the close of the 1952–53 school year the Board drew fixed boundary lines for all elementary schools.[53] These boundary lines were drawn with knowledge of racial residential patterns and the housing discrimination underlying it. Not only did the Board not attempt to promote desegregation, but the boundary lines tended to cement in the segregated character of the elementary schools. In some instances segregation was promoted by drawing boundary lines which did not follow natural boundaries or were not equidistant between schools.[54] In some instances optional attendance zones between white and Negro schools were adopted in racially integrated neighborhoods. From 1949 to 1953 the high school assignments were maintained in the same segregatory pattern and the creation of the predominantly white Harry E. Wood High School on the Manual High School campus helped perpetuate the segregation of nearby Crispus Attucks.

At the time of the Supreme Court decision in *Brown I* in May, 1954, the situation was as follows: Of the sixteen "colored schools" as of 1949, two were closed, one was converted to an all-white school,[55] one was subsequently considered part of the Crispus Attucks "Junior Division," and the other twelve were 97.5% or more Negro. Of 2,787 Negro high school students, 1,618 attended Crispus Attucks, and faculty desegregation was minimal. The Board thus began the post-*Brown I* era in May, 1954, in substantially the same position that it ended the official segregation era in 1949. The schools were still segregated by operation of law, by virtue of the acts and omissions of the Board done in defiance of the new requirements of Indiana law.

## V. BOARD POLICIES, 1954–1968

From the date of *Brown I* to the date of this action, the Board continued the student and faculty assignment policies of the previous era without change.

Since 1954, the most notable nonracial characteristic of the school system has been growth. The total number of elementary pupils rose from 53,352 in 1954–55 to 82,853 in 1967–68, while the number of schools rose from 87 regular elementary and junior high schools and eight regular high schools in 1954–55 to 113 regular elementary and junior high

52. One reason for transfers to be given "special consideration" was if a pupil had an older sibling attending the preferred high school. This operated as a grandfather clause permitting white students to escape Attucks, and remained in effect through March, 1970. Furthermore, proximity per se was not a legitimate reason for transfer, unless a student lived more than two miles from the assigned high school; this prevented Negro students who lived within two miles of Attucks from transferring to other high schools which were closer to their residences.

53. Negro students were, nevertheless, bussed to Negro schools outside their attendance zones from racially mixed areas in at least two cases.

54. For example, the common boundary between Schools 36 (99.3% Negro in 1953–54) and 60 (11.6% Negro) was within one block of School 36 and some eight to ten blocks from School 60. The boundary between Schools 42 (100% Negro) and 44 (1.2% Negro) required Negro students in one area south of School 42 to cross a canal, a parkway, and two railroad tracks to get to School 42; no such impediment stood between this area and School 44. The School 26 (99.8% Negro) common boundary with School 10 (9.7% Negro) required Negro students in the western one to three blocks of the School 26 zone to cross five railroad tracks to get to School 26; no such impediment existed between this area and School 10.

55. School 19 was converted from an all-Negro nonneighborhood school to an all-white nonneighborhood school in September, 1953. Almost all the Negro pupils who had attended School 19 were assigned to School 64, as School 64's attendance zone was redrawn to include almost all the Negro students in the area. School 19 served, in 1953–54, two noncontiguous white areas and was located in neither of them.

schools and eleven regular high schools in 1967–68. This growth caused overcrowding problems in many schools at one time or another, and the Board had available, and employed, various techniques to deal with this overcrowding.

Among these techniques were attendance zone boundary changes, the construction of additions, the construction of new schools, the provision of transportation or the adjustment of existing transportation, alteration in grade structures, and the location or relocation of special education classes in elementary schools. Often these techniques were combined; e. g., in the construction of an addition and a simultaneous boundary change to relieve overcrowding at two contiguous schools.

The defendant Board has constructed numerous additions to schools since 1954; more often than not the capacity thus created has been used to promote segregation. It has built additions at Negro schools and then zoned Negro students into them from predominantly white schools;[56] it has built additions at white schools for white children attending Negro schools; it has generally failed to reduce overcrowding at schools of one race by assigning students to use newly built capacity at schools of the opposite race.[57] The Board has also constructed simultaneous additions at contiguous predominantly white and Negro schools,[58] and has installed portable classrooms at schools of one race with no adjustment of boundaries between it and neighboring schools of the opposite race.

The Board has also constructed additions to large, predominantly Negro elementary schools when desegregation would have resulted from adding classrooms to nearby, smaller predominantly white schools.[59] These large schools have often had inadequate sites.[60] Of the four largest elementary schools in the system, all are more than 90% Negro, and three have had large additions constructed within the last ten years. For example, an eight classroom addition was completed at School 41 in January, 1962, when it was 99.5% Negro, and had a site of 2.7 acres. For the 1970–71 year this school enrolled 1,404 pupils, 99.7% Negro.

An eight classroom addition was completed at School 64 (99.3% Negro) in September, 1962. Nearby Schools 11\

---

56. For example, the Board, after hearing complaints about the number of Negroes at School 60, completed the construction of twelve classrooms at School 36 (99.9% Negro) in September, 1959, and zoned some 180 students, predominantly Negro, from School 60 into School 36. Other students, predominantly white, were assigned to School 60 from School 76.

57. In 1954–55 School 37 (100% Negro) was 104 students over capacity; neighboring School 51 (100% white) was 74 students over capacity. An eight room addition was completed at School 37 in February, 1956. No boundary adjustment was made between 37 and 51, however, and overcrowding at 51 persisted so that by 1958–59, it was 121 students over capacity (and only 1.7% Negro). Finally, in September, 1960, a six classroom addition was completed at School 73 and the boundary between School 51 (5.1% Negro) and School 73 (10.7% Negro) was adjusted so that approximately 75 pupils were sent to School 73 from 51.

58. For example, in January, 1957, nine classrooms were added to School 64's neighbor, School 21; in August, 1957, six classrooms were added to School 64. In 1956–57 and 1957–58, School 21 was 99.22% and 98.23% white, and School 64 was 99.08% and 99.77% Negro. As another example, Schools 27, 29 and 45 are within six blocks of one another. From 1954 to 1957 each received additions of four to eight rooms. At the time of construction, School 29 was 85.3% Negro, while 27 and 45 were 96.5% and and 95.4% white.

59. In April, 1961, a survey of elementary principals was taken by the Board, requesting a "professional opinion" as to maximum, ideal, and minimum school sizes. For a K–8 school, the median ideal size designated by the ninety principals returning the questionnaire was 600; for a K–6 school, 500.

60. The State Superintendent of Public Instruction has established minimum acreage requirements of seven acres for the first 200 students and one acre for each additional 100 students.

(100% white) and 112 (97.9% white) were purchased after annexation and opened that same month. The children from these latter schools in grades 7 and 8 were transported to School 82 even though School 64 was closer to most of these pupils.[61] This continued through the 1965–66 school year. None of these schools other than 64 was more than 4.5% Negro during such years, while 64 was never less than 99.3% Negro. Further, the faculty at School 64 was 96.4% Negro in 1965–66; the faculties at 82, 111 and 112 were all white that same year.

The failure to assign white children to Attucks had important consequences for the Indianapolis elementary schools. Negro students who formerly had been required to attend Attucks regardless of residence were now permitted, in some cases, to attend high schools closer to their homes. Because there was no off-setting assignment of whites to Attucks, through the arrangement of optional zones and nonneighborhood feeder assignments, the Attucks enrollment dropped substantially during the 1950's while the predominantly white high schools increased in enrollment.

Attucks thus had available space during this period, and could, and did, accommodate elementary students from overcrowded Negro elementary schools. At various times since 1954 the following schools, none of which have ever been less than 96.5% Negro, have been assigned to the Crispus Attucks campus: 63,

17, 23, 24, 40, and 4. Several hundred of these pupils attended school in the Crispus Attucks building during the 1950's. The assignment of students from these elementary schools to Attucks should be contrasted with the assignment of other students, predominantly white, from nearby elementary schools to Arsenal Technical High School during this same period.

During the post-1954 period, the Board perpetuated segregation through the use of optional attendance zones. Specifically, in areas of racially mixed residential patterns students were given options between predominantly Negro and predominantly white elementary schools, and where entire elementary districts covered both Negro and white neighborhoods, graduates were given options between predominantly Negro and predominantly white high schools.[62] Students in Negro elementary schools were given options to Crispus Attucks when other, predominantly white high schools were closer and more accessible. White students in optional zones almost always attended white schools.

The Board has perpetuated segregation through the construction of new schools. Specifically, new elementary schools to be attended by students of predominantly one race have been constructed adjacent to schools attended primarily by students of the opposite race,[63] new middle schools have been constructed to enroll the students of one race adjacent to schools attended by students

61. The January, 1967, housing facility study noted that School 82 was "quite crowded during those 4 years" that junior high students were transported to 82 from 111 and 112.

62. School 32 was assigned to Shortridge until September, 1952. At that time, when 32 was 52% Negro, it was given an option to Attucks. By September, 1964, when it was 94% Negro with a 100% Negro faculty, the option was ended and School 32 was assigned solely to Attucks. Similarly, School 44 was assigned to Shortridge until September, 1955, when it was 4.1% Negro. At that time it was given an option to George Washington and

Attucks as well as Shortridge. As the percentage of Negroes continued to rise, both the Shortridge and Washington options were dropped and the students were assigned solely to Crispus Attucks.

63. In March, 1968, a new School 19 building was completed on a site several blocks from the previous School 19. This school was 96.3% white in 1968–69. Its attendance zone is still not justifiable by neighborhood standards, and its construction insured that School 64 (99.5% Negro in 1968–69) would remain virtually all Negro, as it in fact has. A new School 2 (90.4% white in 1958–59) was completed in October, 1958, containing twenty class-

of the opposite race,[64] and new high schools have been located and constructed where they have served predominantly white student populations.[65]

The Board has perpetuated segregation by transporting students from overcrowded schools of one race to schools of the same race rather than to available nearby schools of the opposite race. In contrast to the current local and national hullabaloo about bussing, the Board's minutes record no citizen protests to the bussing of white students to white schools.

The Board has also perpetuated segregation in the assignment of special education classes. Specifically, it has maintained predominantly Negro and predominantly white special education departments at contiguous Negro and white schools and has shifted special education classes between schools with a resultant increase in segregation.[66]

Special education classes often enroll students from a wider area than the normal attendance zone. Thus they can be shifted between several schools in that wider area to relieve overcrowding where necessary. The Board has shifted these classes in some instances and failed to shift them in other instances, always with a resulting increase in racial segregation.

During the 1960's the Board adopted a "Shortridge plan" to prevent Shortridge High School from becoming an all-Negro school. This plan had the immediate effect of reducing the number of Negro students in Shortridge, many of whom subsequently attended Attucks. No steps were taken prior to the filing of this suit, however, to desegregate Crispus Attucks, and an addition to Attucks in 1966 coupled with the effect of the Shortridge plan insured the continuation of segregation at Attucks.[67]

Some of the Board's 1954–1968 segregation practices are evident in simple boundary changes. For example, in 1962–63, School 69 was 57.95% Negro and School 11, its northern neighbor, was 100% white. A housing facility study in February, 1963, noted that, with respect to School 69:

"Census figures for the district indicate a slight decrease during the next five years. The nature of the district is changing considerably, which may cause a further increase; however, serious overcrowding is not anticipated in this district in the next five years."

Despite this assessment, the School 69–School 11 boundary was altered three months later and an all-white area in the School 69 district north of 38th Street was transferred to all-white School 11.[68]

rooms, while nearby School 40 was all Negro.

64. Of the various types and sizes of multi-district junior high schools established in the system since 1954, only one has involved the assignment of Negro majority and white majority schools to the same junior high school.

65. The two most recently constructed high schools in the city (John Marshall and Northwest) have been built on the extreme northeastern and northwestern areas of the city, where the Board knew they would serve virtually all-white areas. Both of these schools have in fact reinforced the growing racial isolation of the inner city.

66. An all-Negro special education department was maintained at Attucks while an integrated department was maintained at Wood through most of this period since Wood was established in 1953. All-Negro

and all-white departments have coexisted in virtually all-Negro School 64 and neighboring predominantly white School 21 almost continuously since September, 1957. Predominantly Negro special education classes exist on the west side at predominantly Negro Schools 63, 52, and 75, while predominantly white classes are housed at nearby predominantly white Schools 30 and 16.

67. Because of the small size of the Attucks site (8.4 acres), a waiver had to be secured from the State Board of Education. This waiver was obtained, with the proviso that no more than 2,200 students attend Attucks; nevertheless, in 1967–68 Attucks enrolled 2,394 students, 2,393 Negro and one white.

68. In a letter to parents in this area, an Assistant Superintendent justified the boundary change because of "crowded conditions" at School 69.

School 69's Negro percentage immediately rose to 72.9.

According to the evidence, there have been approximately 350 boundary changes in the system since 1954. More than 90% of these promoted segregation.

The results of all of the foregoing policies, coupled with the restrictive housing policies of the entire Metropolitan Area, are clear: since 1954 the percentage of Negro students in the system has increased from 20 to 36, and the segregation has likewise increased. The number of 90% or more Negro schools has risen from thirteen to twenty-five. In 1954–55, 85.9% of the Negro elementary students were in majority Negro schools; in 1968–69, the percentage had risen to 88.2. In 1968–69 Crispus Attucks was 99.8% Negro.[69] Faculty and staff were assigned on a racially segregated basis, meaning that Negro schools had all-Negro, or virtually all-Negro faculties, and vice versa. In short, nothing really changed during the 1954–1968 period, and the Indianapolis school system on the date this suit was filed remained segregated by operation of law.

## VI. BOARD POLICIES SINCE MAY 31, 1968

In May, 1968, after the Board received notification of the plaintiff's intention to file suit if deficiencies were not corrected,[70] it contracted with Indiana University to study elementary school boundaries "for the purpose of determining the best method of achieving maximum desegregation of all schools * * * under the neighborhood concept." [71] A "Special Study Committee" of independent consultants was formed, which issued its report in April, 1969, making no recommendations for the promotion of integration through boundary changes. The activities of this Committee may best be characterized as farcical, since according to the testimony of one of its members, it was not furnished with data as to the racial composition of the students or faculty at any school.

In February, 1969, the Board requested a study of, and recommendations for, the desegregation of the Indianapolis schools in a letter to the Office of Education, United States Department of Health, Education and Welfare (hereinafter "HEW"). A team of six educators from HEW visited the system for four days in March, 1969, and prepared a series of recommendations for both the elementary and high schools in the system.[72] These recommendations were presented to the Board on April 18, 1969. On June 17, 1969, the Board rejected the HEW recommendations, finding that they were not a "satisfactory or workable solution to the integration problem of the schools." [73]

In the same statement rejecting the HEW recommendations, the Board called for the appointment of a community-based committee to recommend programs to improve integration, with the first priority directed toward secondary

69. The first white attended that school in 1967–68, when one white student was enrolled.

70. This was a "notice letter" under Title IV of the Civil Rights Act of 1964; 42 U.S.C. § 2000c–6.

71. The so-called "neighborhood concept" was not adopted as a formal policy until 1965 and, as has been demonstrated, has proved meaningless in practice. Its principal use is as a slogan for those opposed to bussing across racial lines.

72. Mr. Johnson, the leader of this team, testified that he recognized that time was too limited to draw a comprehensive plan; therefore, the recommendations of the team were threefold: (a) to study the possibility of grade reorganization to desegregate the system; (b) the submission of a series of specific reorganizations for specific schools to be implemented by September, 1969, as examples of methods of desegregation and as an act of good faith by the Board; and (c) general recommendations for the amelioration of segregation at Crispus Attucks.

73. However, a study of the feasibility of the HEW recommendations undertaken by the Board had concluded that, with respect to the elementary schools, all were feasible except for an alternate plan to desegregate School 64 and the plan to desegregate Schools 43 and 66.

schools.[74] The committee was formed and in October, 1969, filed majority and minority reports. The majority recommended the construction of a new Crispus Attucks (presumably, although not explicitly stated, racially desegregated) and also recommended free transfers for high school students regardless of assignment.[75]

Soon after this report, the Superintendent established a staff committee to treat the problem of the desegregation of Attucks. This committee recommended the construction of a new Attucks and the phase-out of the present Shortridge and Attucks. The Board ultimately rejected the proposed phase-out of Shortridge, but directed the Superintendent to search for a site for the new Attucks; no new site has been found.

During the 1970–71 school year, ninth graders assigned to Attucks under a revised feeder system (which desegregated this ninth grade class) attended school at Northwest High School and the Tudor Hall School.[76] Because no site has been found available for a new Attucks, the defendants plan to assign desegregated freshman and sophomore classes to the present Attucks campus in September, 1971. Grades 11 and 12 will remain virtually all Negro, and if this grade-a-year plan is continued, Attucks will remain partially segregated until September, 1973.

During the 1967–68 school year, the School Board decided to establish a middle school (to be known as the Forest Manor Middle School) housing grades 6, 7, and 8 and serving an area comprising the attendance zones of Schools 1, 71, and 73, each of which elementary schools was then, and is now, severely overcrowded. The building of the Forest Manor Middle School was not begun in 1968, as planned, but the project has been revived, and the School Board is on the point of awarding contracts for the construction of the Forest Manor Middle School. The Board's plans for the utilization of this middle school are being reconsidered, because of plaintiff's objections to its proposed use and location. During the 1970–71 school year the percentage of Negro students at Schools 1, 71 and 73 was 91.4, 92.6, and 69.6, respectively, and the proposed location of the Forest Manor school is in a predominantly Negro residential area. It is apparent that, as matters stand, the proposed school would tend to perpetuate segregation.

The Board adopted a majority-to-minority transfer provision on June 30, 1970. For the 1970–71 school year approximately 400 high school and 50 elementary school students transferred under this provision, and at the time of trial 300 students had applied for such transfers for the 1971–72 school year.[77]

Since this suit was filed the Board has provided various school services on a nondiscriminatory basis.[78] Transfer policies have been administered so as not to increase segregation. A black history curriculum has been developed. Efforts have been made to recruit additional Negro faculty members, and Negro pro-

---

74. Specifically, the committee was to recommend solutions to "the problem presented by Crispus Attucks High School as it now exists."

75. The minority recommended enrichment of the educational program at Attucks and free choice in high school student assignment. The committee submitted no further reports, and did not consider elementary school desegregation.

76. The Tudor Hall School was purchased by the Board for eventual use as a special education facility. The State Superintendent objected to more than 650 students being housed on that site, so part of the Attucks desegregated freshman class was assigned to Northwest High School.

77. Under this provision, students can transfer from a school in which their race is in a majority to a school in which their race is in a minority. The transfers are contingent, under the terms of the policy, on the availability of space, and no transportation is provided. No transfers are accepted under this provision after school has been in session two weeks in September.

78. Among these have been special and social services, lunch programs, libraries, and a program to combat dropouts.

fessional employees have been promoted to responsible positions in the central administrative office. A resolution adopted December 8, 1970, commits the Board to a program for the integration of administrative staffs (including the coaching staff) in each high school.

In October, 1970, the Board entered into a contract with the Office of Education, HEW, under which the latter provided funds for it to employ "advisory specialists" to prepare desegregation plans and in-service training programs for the Indianapolis system. Two such advisory specialists were employed,[79] and presented four plans to the Board on April 1, 1971. Three of these plans treated only eleven all-black, or virtually all-black schools, while the fourth, and recommended plan desegregated every school in the system. On May 25, 1971, the Board rejected all plans, noting that the trial in this cause was to commence July 12, 1971. It thus appears that the Board, having taken some steps toward rectifying its previous failure to comply with *Brown II*, is unwilling to proceed further unless directed to do so by the Court.

## VII. EXTERNAL PROBLEMS FACING THE BOARD

Despite the fact that the Board, through the years, has consistently employed policies and practices causing and maintaining racial segregation in the School System under its control, it is only fair to say that various factors not of its own making have contributed to that result.

### A. Changes in Racial Characteristics of School City

The racial characteristics of the School City changed significantly during the period 1954 through 1970. The number of Negroes residing in the School City increased rapidly, both absolutely and proportionately to the entire population of the School City. The number of areas of the School City in which significantly large groups of Negroes resided increased similarly. The pattern of the change in the location of black residential areas was one of expansion from the center of the School City toward its boundaries. While the Negro population was increasing within the School City, the white population within the School City was decreasing rapidly, and concurrently, the white population in Marion County outside the School City was increasing rapidly.[80]

In 1960, the population of Center Township (all of which, except a small part in Beech Grove, lies within the School City) was 333,351, of which 243,448 (73%) were white and 84,439 (26.8%) were Negro; in 1970, the population of Center Township had declined to 273,598, of which 166,622 (61.2%) were white and 106,112 (38.8%) were Negro.

In 1960, the population of Marion County excluding Center Township was 364,216, of which 353,659 (97%) were white and 10,473 (2.9%) were Negro. In 1970, the population of Marion County excluding Center Township was 518,701, of which 488,538 (94%) were white and 28,342 (5.4%) were Negro. The data also show that, whereas 59% of the white population of Marion County lived outside Center Township in 1960, about 74.5% of that group lived outside Center Township in 1970.

The areas of the School City in which the change in racial composition has been significant in the last ten year period include:

(1) An area bounded, generally, by 38th Street on the north, Arlington Avenue on the east, 21st Street on the south, and Boulevard Place on the west. The eastern part of this area is often refer-

---

79. Both of these specialists were already employees of the Indianapolis system: one was a former principal and consultant, while the other was a former teacher and had held an administrative position in the central office.

80. As found in Section III-C, *supra*, discrimination against Negroes in the matter of housing, enforced or condoned by the City and State has been a major factor in confining the Negro to a compact, central area.

red to as "the Forest Manor area." The change in the racial composition throughout the area is reflected in the changes in the racial composition of several of the elementary schools which serve the area, which changes are shown in the table below:

| School No. | Negro Students (Percent of Total) in 1960–61 | Negro Students (Percent of Total) in 1970–71 |
|---|---|---|
| 1 | 0.16 | 91.4 |
| 11 | 0.0 | 32.5 |
| 51 | 5.09 | 78.7 |
| 53 | 0.21 | 32.6 |
| 60 | 44.55 | 99.6 |
| 66 | 0.44 | 86.1 |
| 69 | 31.31 | 98.5 |
| 71 | 2.92 | 92.6 |
| 73 | 10.73 | 69.6 |
| 76 | 53.61 | 99.0 |
| 83 | (not open) | 41.7 |
| 99 | 0.0 | 29.3 |
| 110 | (not open) | 98.4 |

(2) An area bounded on the north by 63rd Street (Broad Ripple Avenue), on the east by the tracks of the Monon Railroad, on the south by 38th Street, and on the west by the Indianapolis Water Company canal, where similar changes are shown in the table below:

| School No. | Negro Students (Percent of Total) in 1960–61 | Negro Students (Percent of Total) in 1970–71 |
|---|---|---|
| 55 | 0.0 | 8.5 |
| 66 | 0.44 | 86.1 |
| 70 | 0.0 | 28.1 |
| 84 | 0.0 | 2.2 |
| 86 | 12.36 | 53.5 |

(3) Scattered areas, in each of which the population shift is reflected by a similar sharp change in the racial composition of elementary school population, which changes are shown in the table below:

| School No. | Negro Students (Percent of Total) in 1960–61 | Negro Students (Percent of Total) in 1970–71 |
|---|---|---|
| 27 | 45.20 | 87.3 |
| 38 | 38.63 | 91.90 |
| 45 | 28.19 | 98.00 |
| 75 | 24.82 | 77.50 |

At the beginning of the 1970–71 school year, the number of students enrolled in the elementary schools was 79,587, excluding students enrolled in the special education schools. During the 1970–71 school year, that total enrollment was reduced to 77,658; the difference of 1,929 between the October and June enrollment totals is the net result of a departure of 2,122 white students from the elementary schools and an inflow of 193 Negro students to the elementary schools. Of the 110 elementary schools, 13 showed gains, and 81 showed losses, in the number of white students enrolled during the 1970–71 school year.

## B. Low-Rent Housing Projects

Low-rent housing projects within the School City have significantly affected the racial composition of the schools. A project typical of this kind is constructed at the periphery of an established Negro residential area and, for that reason among others, attracts a Negro occupancy, which is eventually reflected in the racial composition of the school that serves the area in which the project is situated.

Such an effect is to be seen in several elementary schools, including: School 67, in which Negroes constituted 4% of the student body in 1968–69 and 30.9% in 1970–71, owing to the opening of Eagle Creek Village at Tibbs Avenue and Cossell Road; School 112, in which Negroes constituted 13.7% of the student body in 1968–69 and 42.9% in 1970–71, owing to the opening of Raymond Villa, at Raymond Avenue and Perkins Street; School 71, in which Negroes constituted 10.8% of the student body in 1965–66 and 92.6% in 1970–71, owing to the opening of Hawthorne Place at 32nd Street and Emerson Avenue; and School 99, in which there were no Negro students in 1968–69 and in which Negroes constituted 33.9% of the student body at the end of the 1970–71 school year, owing to the opening of Beechwood Gardens at 30th Street and Graham Avenue.

Housing projects of the kind just described not only have racial consequences for the schools; each of them tends to represent, as well, a demand for a significant amount of school space. Eagle

Creek Village, Raymond Villa, and Beechwood Gardens necessitated additions to Schools 67, 112, and 99, respectively, each of which cost about $1,300,000. Salem Village, at 30th Street and Baltimore Avenue, necessitated the construction of a complete school (School 110), which has served a virtually all-black student body since it was opened in 1966.[81]

## C. Noncooperation of Local Officials

Some of the reasons why no new site for Attucks has been acquired are directly attributable to action or inaction on the part of certain agencies of the civil government of the City of Indianapolis. One possible site is a 54 acre, undeveloped tract at the southwest corner of the intersection of 38th Street and White River. Although a part of the land is low, there is more than adequate high ground for buildings, and the low ground is protected by a levee. This tract is owned by the City of Indianapolis, which could presumably make it available to the School City free under Indiana law,[82] or in any event make the transfer for a nominal price.[83] However, the City has declined to consider parting with the 54 acres, on the ground that it is needed for use as a nursery for the Department of Parks and Recreation. The City's sense of priorities strikes the Court as curious.[84]

Another likely site for the new Attucks was determined to be a tract at 30th Street and Guion Road, and the Board acquired an option to purchase the tract. It then filed an application to have the land rezoned for school use, only to have its application denied by The Metropolitan Development Commission of Marion County, which asserts the right to control the use of all land in the county, including that proposed to be dedicated for public purposes.

## D. Legislative Action Since 1949

As noted briefly above, the State's long time policy of *de jure* segregation obstensibly ended in 1949 with the passage of Chapter 186 of the Acts of that year.[85] The new policy of the State, as set out in the first section of the Act, was stated to be as follows:

"It is hereby declared to be the public policy of the State of Indiana to provide, furnish, and make available equal, nonsegregated, nondiscriminatory educational opportunities and facilities for all regardless of race, creed, national origin, color or sex; to provide and furnish public schools and common schools equally open to all and prohibited and denied to none because of race, creed, color, or national origin; to reaffirm the principles of our Bill of Rights, Civil Rights and our Constitution and to provide for the State of Indiana and its citizens a uniform democratic system of common and public school education; and to abolish, eliminate and prohibit segregated and separate schools or school districts on the basis of race, creed or color; and to eliminate and prohibit segregation, separation and discrimination on the basis of race, color or creed in the pub-

81. The plaintiff United States of America, which of course sponsors federally supported housing projects, has suggested a finding that the locations of six of the ten projects opened in the School City since 1965 have tended to promote integration in those instances. There is insufficient evidence to support such a finding.

82. See Acts 1957, Ch. 229, p. 501, as amended; Burns Ind.Stat.Ann. §§ 53-403, 53-404, I.C.1971, 5-18-1-1, 5-18-1-2.

83. The Court estimates that the cost of a school site in an appropriate location, if purchased on the open market, would run from at least $12,500 to $17,500 per acre.

84. In addition to the fact that use of the White River tract as a nursery does not appear to be its highest and best use, it is also instructive to note that the Department has available for nursery purposes various parts of the 2,650 acre non-reservoir portion of its virtually undeveloped Eagle Creek Park. Note also that approximately half of the 54 acres would meet State per-pupil minimum land requirements (Footnote 60, *supra*), leaving the balance available for planting to trees and shrubs.

85. Note 50, *supra*.

lic kindergartens, common schools, public schools, colleges and universities of the state."

Note that the State completely anticipated and completely adopted the holding in *Brown I* by a full five years. Because of *Brown I*, moreover, it is impossible for the State legally to change its professed policy, because that policy has now assumed the stature of a Constitutional imperative, far above the power of the State to detract therefrom. With these principles in mind, the Court examines certain post-1949 legislation enacted by the General Assembly.

Historically, it was well established by the common law of the State that whenever an incorporated city or town expanded its corporate limits, the school city or town succeeded to the powers and duties of the township trustee with respect to the administration of the public schools. In other words, the boundaries of a school city and of a civil city were coterminous.[86] This rule was recognized in a 1931 Act, pertaining to the defendant School Board, as follows: "In each civil city of this State having * * more than three hundred thousand [300,000] inhabitants there shall be a common school corporation hereinafter called the 'school city' whose duties and powers shall be coextensive with the corporate boundaries of such civil city. * * *"[87] When such Act was amended in 1955 in order to increase the size of the Board, among other things, such provision remained unchanged.[88]

However, in 1961 the General Assembly crippled this policy by an Act which provided that, with respect only to Marion County, the extension of the boundaries of a civil city by a civil annexation would work only a prima facie extension of the boundaries of the school city, and render such school city extension subject to a separate remonstrance by the losing school corporation.[89] Thus, for the first time, it became possible for the School City of Indianapolis, alone among the major school cities of the State, to have jurisdiction over a lesser territorial area than the corresponding civil city.

Even more grave in import are Chapters 52 and 173 of the Acts of the 1969 General Assembly. Section 3 of Chapter 52 amended Chapter 186 of the Acts of 1961 to abolish the concept that the school and civil cities in counties having a city of the first class[90] would have coterminous boundaries, and limited the School City of Indianapolis to enlarging its territory by one of the two methods authorized in the 1961 Act in addition to automatic prima facie extension on enlargement of the civil city: (1) by agreement with the school corporation losing territory, or (2) by unilateral annexation by the School City of all or part of the territory of another school corporation.[91] Both procedures are subject to remonstrance. Further, said Section repealed Section 9 of Chapter 186 of the Acts of 1961 as to all enlargements of the School City claimed to have been made pursuant to civil city annexations and not yet finally effective. I. e., in cases where remonstrances and/or court actions were pending against School City annexations pursuant to Section 9 of the

---

86. Board of School Com'rs v. Center Twp., 1896, 143 Ind. 391, 42 N.E. 808; School Twp. of Allen v. School Town of Macy, 1887, 109 Ind. 559, 10 N.E. 578; School Town of Leesburgh v. Plain School Twp., 1877, 86 Ind. 582; State ex rel. Mt. Carmel School Corp. v. Shields, 1877, 56 Ind. 521; Carson v. State, to Use of Town of Hanover, 1867, 27 Ind. 465.

87. Acts 1931, Ch. 94, § 1, p. 291; Burns Ind.Stat.Ann. § 28–2301 (1948 Repl.), I.C.1971, 20–3–11–1.

88. Acts 1955, Ch. 123, § 1, p. 291; Burns Ind.Stat.Ann. § 28–2301 (1968 Cum. Supp.).

89. Acts 1961, Ch. 186, §§ 1, 9, 10; Burns Ind.Stat.Ann. §§ 28–2338, 28–2346, 28–2347 (1968 Cum.Supp.), I.C.1971, 20–3–14–1, 20–3–14–10.

90. Indianapolis is the only city of the first class in Indiana.

91. Acts 1969, Ch. 52, § 3, p. 57; Burns Ind.Stat.Ann. § 28–2346a (1970 Cum. Supp.), I.C.1971, 20–3–14–9.

1961 Act, the annexations were simply canceled by legislative fiat.

Chapter 173 [92] is formally titled the "Consolidated First Class Cities and Counties Act," and is hereafter referred to by its more familiar name, "Uni-Gov." This Act purports, in general, to consolidate the civil governments of the former City of Indianapolis and of Marion County into a unified, metropolitan, city government, with certain exceptions,[93] which expanded or consolidated city continues to be known as the City of Indianapolis.

The Uni-Gov Act provides expressly that "any school corporation, all or a part of the territory of which is in the consolidated city or county" shall not be affected by the Act.[94] Thus Uni-Gov leaves the defendant School City exactly where it found it: confined to an area in the central part of the consolidated City of Indianapolis, where it is surrounded by eight township school systems operating independently within the purportedly unified City, and by two additional independent school corporations operated by Beech Grove and Speedway City (hereinafter, in the aggregate, "outside school corporations"). For the 1969–70 school year these outside school corporations together had 73,205 students enrolled, of whom 2.62% were Negro, and together employed 3,037 teachers, of whom 15, or 0.49%, were Negro.

The outside school corporations compete effectively with the School Board for teachers. Since the filing of this action, some white teachers employed by the Board and requested to transfer to integrated schools have declined transfer and found havens in the outside schools. The outside schools have likewise contributed to the exodus of white students from the School City by accepting them for transfer, on payment of tuition.

Considering the history of segregation of the Negro in Indiana and in Indianapolis, the racial complexion of the outside school corporations and of the adjoining counties in the Indianapolis Metropolitan Area, the ongoing flight to the suburbs by the white population of the School City, and the various other factors above set out, the effect of the 1961 and 1969 Acts of the General Assembly referred to in this section may well have been to retard desegregation and to promote segregation. In other words, under previous Indiana law, which still applies to all cities except Indianapolis, civil annexation would automatically carry school annexation with it, and the chances of successful remonstrance against logical annexation by an expanding municipality, carrying with it the usual municipal services, would be virtually nil. Under the present law, if valid, the ability of the Board to expand its jurisdiction coterminous with the consolidated city, or for that matter to expand it at all, is likewise virtually nil, as a practical matter.

### E. The Tipping Factor

The undisputed evidence in this case, agreed to by plaintiff's expert from the Office of Education, is that when the percentage of Negro pupils in a given school approaches 40, more or less, the white exodus becomes accelerated and irreversible. Therefore, resegregation rapidly occurs, and the entire central core of the involved city develops into a virtually all-Negro city within a city when, as in Indianapolis, the Negro residential area is largely confined to a portion of the central city in the first place.

---

92. Acts 1969, Ch. 173, p. 357; Burns Ind. Stat.Ann. §§ 48–9101–48–9507 (1970 Cum. Supp.), I.C.1971, 18–4–1–1 to 18–4–5–4.

93. The cities of Beech Grove and Lawrence ("excluded cities") and the incorporated town of Speedway City ("excluded town") are permitted to carry on as separate municipal corporations within the territory of the consolidated city, but the voters of these communities are entitled to vote for candidates for the offices of mayor and city-county councilman of the consolidated city, as well as for the corresponding officials of their respective excluded city or town.

94. Acts 1969, Ch. 173, § 314, p. 357; Burns Ind.Stat.Ann. § 48–9213 (1970 Cum.Supp.), I.C.1971, 18–4–3–14.

During the trial, this Court repeatedly attempted to cause the plaintiff United States of America to produce statistics from HEW showing comparative racial statistics for the school systems of the larger school cities of the nation before and after active desegregation efforts were commenced. The Court was advised that no such statistics were available, incomprehensible as that might seem considering that such Department is the Federal agency directly concerned with the problem.

However, according to HEW's news release of June 18, 1971, in evidence, the percentage of Negro students in certain public school systems as of fall, 1970 was as follows (in order according to total pupils in system): New York 34.5; Chicago 54.8; Detroit 63.8; Philadelphia 60.5; Houston 35.6; Baltimore City, Maryland 67.1; Cleveland 57.6; Washington, D. C. 94.6; Memphis 51.5; St. Louis 65.6; Orleans Parish (New Orleans), Louisiana 69.5; Atlanta 68.7; Birmingham 54.6; Caddo Parish (Shreveport), Louisiana 49.0; Louisville 48.3; Richmond, Virginia 64.2; Gary 64.7; and Compton, California 82.0. In some of these cities an additional sizable percentage of the student population belongs to another minority group which historically has been, and still is subject to racial discrimination: those with Spanish surnames, presumably of Mexican or Puerto Rican descent. When these percentages are added, the total minority race percentage of pupils in such cities is as follows: New York 60.2; Chicago 64.6; Houston 50.0; and Compton, California 94.4. All of these school cities, as well as others which could be named,[95] appear to be completely beyond hope of meaningful desegregation, absent some dramatic change in their boundaries. In the absence of HEW statistics to the contrary, the Court infers that desegregation efforts have had much to do with the current figures as above quoted.

The brutal truth as to what may happen when a court and a school board undertake in good faith to apply across-the-board desegregation in situations when racial balances reach the tipping point is well illustrated in the rather poignant opinion of the United States District Court for the Northern District of Georgia, Atlanta Division, Calhoun et al. v. Cook et al., 332 F.Supp. 804, handed down on July 28, 1971. Pointing out that Atlanta in 1961–62 was one of the first major southern cities officially abandoning the dual school system, it noted that in the ten year interim the balance has shifted from 70%–30% white to 70%–30% Negro, and that the remaining 30% whites were themselves confined to two areas. The court declined to order further enforced measures, as being futile.

## VIII. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action under Section 407 of the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6) and under 28 U.S.C. § 1345.

■ 2. Pursuant to the Fourteenth Amendment and Title IV of the Civil Rights Act of 1964 this Court has jurisdiction to hear and to decide all issues concerning alleged racial discrimination in public education in the Indianapolis School System, including the defendant Board's policies with respect to assignment and transfer of students, the allocation of faculty and staff, the location and construction of schools, the transportation of students, and the general educational structure and process. United States v. School District 151, N.D. Ill., 1968, 286 F.Supp. 786, aff'd 7 Cir., 1968, 404 F.2d 1125.

■ 3. The Court having found for the plaintiff that the defendant School Board was on May 17, 1954, May 31, 1968, and as of the date of trial operating

---

95. Strangely, the HEW release failed to list Newark, New Jersey, where the combined minority percentage is known to be at least 70.

a segregated school system wherein segregation was imposed and enforced by operation of law, the law is with the plaintiff. Therefore, the Board is "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination (will) be eliminated root and branch." Brown v. Board of Education (*Brown II*), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Green v. County School Board, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

■ 4. All provisions of federal, state or local law requiring or permitting racial discrimination in public education must yield to the principle that such discrimination is unconstitutional; revisions of local laws and regulations and revision of school districts may be necessary to solve the problem. *Brown II*.

■■ 5. This Court has continuing jurisdiction to make and enforce such decrees in equity as are necessary to accomplish the above mentioned objective. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. Swann v. Charlotte-Mecklenburg Bd. of Ed. ("*Swann*"), 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554.

## IX. FURTHER PARTIES AND PROCEEDINGS

As noted herein, the percentage of Negro elementary pupils within the School City had reached 37.4 as of the past school year, and was slowly rising. Fortunately, the change has not yet become a rout, and the Court recognizes that a substantial part of the increase during the past fifteen years has been caused by inmigration from the Southern States, which has virtually ceased. The Court is further of the opinion that

the white citizens of this community are less likely than those of certain of the cities listed in part VII hereof to succumb to the enslavement of unreasoning racial fears, and recognizes that there are many good reasons for moving to the suburbs which have nothing to do with this case.

Nevertheless, it is obvious that something more than a routine, computerized approach to the problem of desegregation is required of this Court, lest the tipping point be reached and passed beyond retrieve.[96] This is particularly true in the light of the dictum in *Swann* to the effect that "neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." Put another way, the easy way out for this Court and for the Board would be to order a massive "fruit basket" scrambling of students within the School City during the coming school year, to achieve exact racial balancing, and then to go on to other things. The power to do so is undoubted. There is just one thing wrong with this simplistic solution: in the long haul, it won't work.

With due regard for the opinions of the many other courts which have grappled with the problems here involved, and with full knowledge of the countless hours of research, heartache, and soul searching which have doubtless gone into them, this Court is compelled to say that the common characteristic of most of them is tunnel vision. In interpreting the mandate of *Green* "to come forward with a plan that promises realistically to work, and promises realistically to work *now*," they have tended to stress the same word stressed by the Supreme Court, and in doing so have focused ex-

---

96. The plight of the Negro citizen, still striving for equality 352 years after Jamestown, recalls the familiar words of the Red Queen to Alice: "Now here, you see, it takes all the running you can do, to keep in the same place. If you want to get somewhere else, you must run at least twice as fast as that!" L. Carroll, Through the Looking-Glass.

clusively on the school board defendant. If the school system involved is already at or near the tipping point, nothing is accomplished save the unfortunate results noted above in various of our major cities. As to the *Green* command, this Court prefers to stress its major thrust: promises realistically to *work*. (This Court's emphasis.)

Realistically, it is clear that the tipping point/resegregation problem would pale into insignificance if the Board's jurisdiction were coterminous with that of Uni-Gov. It would be minimized still further if extended to Lawrence, Beech Grove and Speedway City, and to certain parts of the adjoining counties practically indistinguishable from the City of Indianapolis, such as the Carmel area of Hamilton County and the Greenwood area of Johnson County. Certain legal questions immediately spring to mind which cannot, or at least should not be answered without the joinder of additional parties to this action.

Some of these questions are as follows:

1. Are Chapter 186 of the Acts of 1961, Chapter 52 of the Acts of 1969, and Chapter 173 of the Acts of 1969, or any of them, unconstitutional as tending to cause segregation or to inhibit desegregation of the Indianapolis School System?

2. If the answer to Question 1 is in the affirmative, did passage of the Uni-Gov Act automatically extend the boundaries of the School City coterminous with the boundaries of the Civil City, as provided generally by Indiana law?

3. If both of the foregoing questions are answered in the affirmative, are Lawrence, Beech Grove, and Speedway City presently under the jurisdiction of the defendant Board, or does Uni-Gov

merely have the effect of annexing the eight township school corporations?

4. Regardless of the answer to the first three questions, should the General Assembly, by appropriate legislation, provide for the creation of a metropolitan school district embracing all of Marion County, together with all or some substantial part of the other counties going to comprise the Indianapolis Metropolitan Statistical Area, in order to purge the State of its role in contributing to *de jure* segregation in the Indianapolis School System?[97]

5. If the answer to Question 4 is in the affirmative, and the General Assembly fails to act within a reasonable time, or in a reasonable way, does this Court have the power to create such a metropolitan school district by judicial decree?[98]

Other questions likewise require an answer:

6. Does the Metropolitan Development Commission of Marion County have the power to deny the School Board its choice of sites for Crispus Attucks or other new schools? Put another way, does this Court have the power to override such Commission if it finds that its rulings interfere with desegregation?

7. Does this Court have the power to override rulings of the said Development Commission or of any other involved agencies with regard to the location of low-rent housing projects, if it finds that the locations of such projects interfere with desegregation, or tend to cause resegregation?

The plaintiff is ordered to proceed forthwith to prepare and file appropriate pleadings to secure the joinder herein as parties defendant of the necessary municipal corporations and school corporations which would have an interest in

97. The State has the undoubted power to abolish, consolidate, eliminate, or create new governmental corporations. Woerner v. City of Indianapolis, 1961, 242 Ind. 253, 177 N.E.2d 34.

98. Is there, for example, an analogy between the power of the Court in desegre-

gation cases, and the power of the Court in cases involving legislative or congressional redistricting, both of which arise out of the equal protection clause of the Fourteenth Amendment? cf. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

questions 1–5, inclusive, and to seek such relief as to the plaintiff seems justified. The defendant is ordered to proceed similarly as to those agencies which would appear to have an interest in questions 6 and 7, joining them as third party defendants. Because of the interest of the State of Indiana in the constitutionality of its laws, its Attorney General should also be served by the plaintiff.

Nothing herein should be construed as limiting the parties to consideration of the seven questions above suggested. Other questions may well occur to them which would involve additional parties, and if so they should feel free to proceed accordingly and to seek whatever relief seems appropriate.

Further, it may be that the opinions herein expressed, the questions herein propounded, and the orders herein made will cause individuals or bodies politic to desire to intervene herein. Petitions for intervention will be given careful consideration.

## X. ORDER OF THE COURT

Finally, what is to be done pending decision of the questions above set out? The order of the Court in this regard is as follows:

It is hereby ordered that the defendants, their successors in office, officers, agents, employees and all those in active concert or participation with them, are permanently enjoined from discriminating on the basis of race in the operation of the Indianapolis School System.

It is further ordered that the defendants take, at a minimum, the following specified actions to fulfill their affirmative duty to achieve a nondiscriminatory school system:

(1) Immediately take steps to assign faculty and staff so that no school is racially identifiable from the racial composition of its faculty or staff. Mandatory assignments or reassignments are to be made if necessary, and the assignments to achieve full desegregation will be made prior to or with the opening of schools in September, 1971. This Court further notes that the evidence adduced in this cause shows that, in faculty and staff reassignment heretofore effected, these reassignments have tended to result in more experienced Negro faculty and staff being transferred and/or assigned to schools attended predominantly by white students and more inexperienced white faculty and staff being transferred and/or assigned to schools attended predominantly by Negro students. Defendants should, accordingly, redress or tend to redress this situation in making whatever assignments or reassignments that are necessary to comply with this order.

(2) Immediately continue with their plans to desegregate and relocate Crispus Attucks High School.

(3) Immediately amend the "majority-to-minority" transfer policy to conform to the requirements enunciated by the Supreme Court in *Swann*, so that such transfers are not to be dependent upon availability of space in the receiving school and so that transportation will be provided, upon request, to students making such transfers. Provided, however, that the Board may request authority to designate the transferee school or schools in the event that extreme diffusion of requests presents practical problems of transportation, or in the event that extreme concentration of requests threatens the racial stability of a given school, i. e., the tipping point factor.

(4) Immediately give all possible publicity to students and parents of students who may be eligible for transfer under (3), regarding the new policy.

(5) Immediately attempt to negotiate with the outside school corporations for possible transfer of minority race students to such outside schools, including high schools, for the coming school year.[99]

---

99. If the outside school corporations have the capacity to accept transfer of white students, they have the capacity to accept minority race students. Further, the Board has available many portable classrooms and could, with a little imagination, "lend-lease" teachers, if necessary.

(6) Immediately resurvey the probable racial make-up of all schools for the 1971–72 school year, and take appropriate action to prevent schools, including high schools, now having a reasonable white-black ratio from reaching the tipping point. Transportation of students into or out of such schools shall be resorted to as required.[100]

(7) Immediately cease and desist from going forward with construction of the Forest Manor School until the Court hears further evidence on this subject.

It is recognized that the orders thus far made will not result in significant desegregation of majority-black schools immediately, unless the voluntary transfer and outside school corporation transfer policies are unusually successful. It is also recognized that mandatory transfers to maintain stability pursuant to subparagraph (6) may largely involve Negro students, as is certain with regard to transfers to the outside school corporations. Neither of these facts seems "fair" in a theoretical sense, and have caused the Court a great deal of concern. However, there is a limit to what can be accomplished at one time, and final plans cannot be made until answers are found to the seven legal questions posed. Determination of such questions will be expedited to the utmost degree consistent with due process.

Meanwhile, the defendants are directed to file, on or before September 3, 1971, the plans they propose for the 1971–72 school year pursuant to the within order and on their own initiative, with the usual copies to counsel and amicus curiae, who shall have the right to object thereto and/or to make their own suggestions within ten days thereafter. Such plans shall include their current proposals regarding the site of and assignment of pupils to the proposed Forest Manor Middle School.

It is finally considered and adjudged that the defendant School Board pay the costs of this action.

---

100. This Court regards the outcry made in some quarters against "bussing" as ridiculous, in this age of the automobile. Most students in the outside school corporations have been bussed for years, with never a complaint against bussing per se. Students required to be bussed could be required to walk to their former schools for ease of pick-up and speed in delivery.